## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRADY SCOTT WESTON, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>           v.<br><br>RCS CAPITAL CORPORATION, NICHOLAS S. SCHORSCH, MICHAEL WEIL, WILLIAM M. KAHANE, and BRIAN D. JONES,<br><br>                Defendants. | Case No.<br><br>**14 CV 10136**<br><br>**CLASS ACTION**<br><br>**JUDGE DANIELS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>RECEIVED<br>DEC 29 2014<br>U.S.D.C. S.D. N.Y. |

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Grady Scott Weston ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RCS Capital Corporation ("RCS Capital", "RCAP" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired RCS Capital securities between February 12, 2014 and October 31, 2014, both dates inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     RCS Capital purports to be a full-service investment firm expressly focused on the individual retail investor. With operating subsidiaries including: retail advice services, wholesale distribution, investment banking and capital markets and investment research, and crowdfunding, RCS Capital asserts that it is designed to protect, support, grow and maximize value for the investment programs it distributes and the independent advisors and clients it serves.

3.     The Company operates through three subsidiaries in four principal segments: (1) Wholesale Broker-Dealer; (2) Transaction Management; (3) Investment Banking and Capital Markets; and (4) Transfer Agent. RCS Capital currently provides financial advice to approximately 2.6 million households through a network of approximately 8,900 financial advisors as well as institutional financial services.

4.     The Company purports to be a leading distributor of direct investment programs in the United States, with a 41.2% market share measured by equity capital raised in 2013, of non-publicly traded real estate investment trust ("REITs"), the largest segment of direct investment programs. In addition, RCS Capital's investment banking, capital markets and transaction management services platform was the second largest advisor of real estate mergers and

acquisitions transactions in the United States in 2012 and 2013, as measured by total value of announced transactions, according to SNL Financial.

5.      Since the Company's initial public offering in June 2013, RCS Capital has grown rapidly through various acquisitions in the Company's four principal business segment platforms. The Company contends that completing the acquisitions has further enabled it to expand its business by increasing revenues, providing the Company with the opportunity to attract and retain financial advisors for its independent retail advice platform and expanding its ability to pursue strategic transactions. Moreover, the Company seeks to expand its client base to include unrelated third-party sponsors and direct investment programs, because, according to RCS Capital's 2013 Form 10-K, it "believe[s] that our plans for growth will allow us to increase our revenues and to expand our role with clients as a valued advisor."

6.      To that end, on October 1, 2014, RCS Capital announced the acquisition of Cole Capital Partners L.L.C. and Cole Capital Advisors Inc. (collectively, "Cole Capital") from RCS Capital's sibling company American Realty Capital Properties Inc. ("ARCP"), for a base purchase price of $700 million consisting of $200 million of cash, $300 million of seller debt, and $200 million of RCS Capital Class A common stock. Cole Capital assists in arranging sales of real-estate investment trust shares to investors. According to RCS Capital's press release:

**Transaction Highlights**

*Cole Capital Adds Seven Investment Programs to RCAP's Distribution Platform:* The acquisition of Cole Capital will add seven investment programs to RCAP's suite of investment products, including Cole Corporate Income Trust (CCIT), Cole Credit Property Trust IV (CCPT IV), Cole Office & Industrial REIT (CCIT II), Cole Credit Property Trust V (CCPT V), Cole Real Estate Income Strategy (Daily NAV) and two future programs, Cole Credit Property Trust VI (CCPT VI) and Cole Office & Industrial REIT (CCIT III). These programs represent nearly $19 billion in registered equity offerings and over $30 billion in estimated aggregate buying power.

3

***RCAP Adds Net Lease Real Estate Offerings:*** RCAP expects to benefit significantly from adding net lease real estate offerings to its wholesale distribution platform. Between 2008 and 2013, RCAP, through its wholly owned wholesale broker-dealer Realty Capital Securities, LLC ("RCS"), raised over $8.5 billion of equity capital for net lease real estate programs. RCAP believes that capitalizing on market awareness of the Cole Capital brand and adding net lease offerings will increase both the amount and velocity of capital raised on its platform.

***RCAP Engages ARCP as Exclusive Sub-Advisor:*** In connection with the sale, RCAP has engaged ARCP to act as sub-advisor to certain non-traded real estate investment trusts currently advised by Cole Capital. ARCP will be responsible for acquiring net lease real estate for Cole Capital's managed real estate investment trusts and overseeing property management activities. This sub-advisor arrangement brings together two of the most accomplished participants in the direct investment net lease real estate industry.

***Addition of Cole Capital Augments RCAP's Asset Management Business:*** The acquisition of Cole Capital increases RCAP's assets under management and the scale of its Investment Management business segment. Cole Capital estimates over $9.5 billion of managed assets by year-end 2014 in five non-traded REITs and other programs, including funds that closed in the second half of 2014 and that are under contract. RCAP also expects Cole Capital to add $73.7 million of recurring asset management EBITDA in 2015.

7.    As a result of the announced Cole Capital acquisition, shares of RCS Capital increased $1.29, or approximately 6%, to close at $23.81 on October 1, 2014, on extremely heavy trading volume.

8.    Significantly, ARCP, the Company from which RCS Capital intended to purchase Cole Capital, is controlled by the same principals who control RCS Capital, including defendant Nicholas S. Schorsch, who founded and serves as the executive chairman for both companies and owns 19.2 million RCS Capital shares as of June 30, 2014, amounting to approximately 29% of the total outstanding RCS Capital shares. Additionally, ARCP has accounted for 80% of RCS Capital's total revenues for the year ended December 31, 2013. For example, all of the $28.1 billion in value of mergers and acquisitions transactions, all of the $22.7 billion in purchase price of equity capital markets transactions, and all of the $10.3 billion of debt capital markets transactions on which RCS Capital's investment banking and capital markets business advised in

2013 *related to transactions involving direct investment programs or entities which had been sponsored or managed by ARCP.* Moreover, $*713.5 million of RCS Capital's $886.5 million in revenues in 2013* resulted from sales of equity capital of direct investment programs or other entities sponsored or managed by ARCP. As such the business prospects of RCS Capital were inextricably intertwined with those of ARCP.

9.      Throughout the Class Period, however, Defendants made materially false and misleading statements regarding the Company's business and future acquisition prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) ARCP's financial statements were materially false and misleading as a result of a massive accounting scandal perpetrated and concealed by senior management, including Nicholas Schorsch; (2) RCS Capital's announced acquisition of Cole Capital from ARCP was at serious risk due to the fraud being perpetrated at ARCP; (3) RCS Capital's revenue stream from its relationship with ARCP was in jeopardy as a result of the accounting scandal at ARCP; and as a result of the foregoing, (4) RCS Capital's public statements pertaining to its financial position as well as the Cole Capital acquisition were materially false and misleading at all relevant times.

10.      Indeed, while RCS Capital was touting the benefits of the Cole Capital Acquisition from ARCP, ARCP was in the midst of investigating and discovering a massive accounting scandal that several high-level executives had covered up for years. Specifically, On October 29, 2014, ARCP disclosed that its Audit Committee had determined that an "error" in accounting for adjusted funds from operations ("AFFO") had previously been identified within the ARCO, but *was intentionally not corrected*, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the company's net loss for the three and six months ended June 30, 2014. ARCP also announced that the previously issued

5

financial statements and other financial information contained in the Company's annual report for the year ended 2013, quarterly reports for the periods ended March 31, 2014 and June 30, 2014, and the company's earnings releases and other financial communications for these periods, should no longer be relied upon. Concurrently with this disclosure, ARCP announced the resignation of its Chief Financial Officer and Chief Accounting Officer, both of whom had key roles in preparing the allegedly fraudulent financial statements.

11.     Moreover, according to the *Wall Street Journal*, the Federal Bureau of Investigation has opened a criminal investigation into ARCP. The SEC also plans to open an inquiry into the company, according to a person familiar with the situation.

12.     As a result of the accounting scandal revealed at ARCP, RCS Capital announced on November 3, 2014 that it has ***terminated*** the previously disclosed definitive agreement to acquire Cole Capital from ARCP.

13.     As a result of this news, shares of RCS Capital fell $2.72, or more than 16%, on extremely heavy volume, to close at $13.69 on November 3, 2014.

14.     On November 7, 2014, after the close of trading, it was reported on *Thinkadvisor.com* that Massachusetts regulator William Galvin commenced an investigation of RCS Capital relating to the accounting errors were disclosed at ARCP.

15.     As a result of this news, shares of RCS Capital fell $0.65, or more than 5.7%, on heavy volume, to close at $10.67 on November 10, 2014.

16.     On November 14, 2014, the Company filed a quarterly report on Form 10-Q with the SEC. In the 10-Q, the Company confirmed the investigation by the Massachusetts Securities Division, stating in part:

On November 7, 2014, Realty Capital Securities received a subpoena from the Massachusetts Secretary of the Commonwealth, Securities Division (the "Division"), requiring the production of certain documents and other materials, dated from January 1, 2014 to the present, relating to sales by Realty Capital Securities of certain non-traded REITs and similar products sponsored or co-sponsored by AR Capital, LLC. The Company is actively complying with the subpoena and cooperating with the Division.

In addition, in the course of the Company's customary operations, its subsidiary broker-dealers, including but not limited to Realty Capital Securities, engage in ordinary course conversations with the SEC, FINRA and multiple state securities administrators and their regulatory agencies, including with respect to review of non-traded REIT and similar product offerings. Since ARCP's October 29, 2014 announcement regarding its historical financial statements and internal controls, the Company and its subsidiaries have continued to respond to on-going verbal inquiries, requests for correspondence, information and discussions with the SEC, FINRA and such state regulatory agencies, including with respect to the ARCP disclosure.

17.    On November 17, 2014, after the close of trading, it was reported on

*Thinkadvisor.com* that RCS Capital was contacted by the Financial Industry Regulatory Authority

("FINRA") and the SEC relating to the accounting errors disclosed at ARCP.

18.    On December 4, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing that it had reached an agreement with ARCP to settle litigation relating

to the Company's termination of the agreement to acquire Cole Capital Partners LLC from ARCP.

In the press release, the Company stated in part:

Pursuant to the terms of the settlement, RCS Capital has agreed to pay ARCP a negotiated break-up fee consisting of a cash payment of $32.7 million and a $15.3 million, two-year promissory note . . . RCS Capital and ARCP have also agreed, among other things, that ARCP will keep the $10 million payment delivered by RCS Capital in connection with the first closing and RCS Capital will release ARCP from its obligation to pay $2 million to RCS Capital in respect of structuring services provided by Realty Capital Securities, LLC, a subsidiary of RCS Capital, in connection with ARCP's May 2014 equity offering.

19.    On December 15, 2014, ARCP issued a press release announcing the resignation of

Schorsch as its executive chairman and director. In the press release, ARCP also announced stated,

in part:

7

In connection with Mr. Schorsch's departure as Executive Chairman, ARCP will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder. These steps will not only enhance the Company's corporate governance structure but will also lead to further simplification of its business relationships.

20.     While not specifically mentioning RCS Capital, it was clear that that ARCP's "unwinding" of its relationships with "entities in which Mr. Schorsch maintains an executive or director-level role" included its relationship with RCS Capital. This would eliminate a significant source of the Company's revenue, as 80% of such revenues for 2013 came from ARCP.

21.     As a result of this news, shares of RCS Capital fell $1.35, or more than 11%, on heavy volume, to close at $10.46 on December 15, 2014.

22.     On December 18, 2014, the *Wall Street Journal* reported that a lawsuit was filed against Schorsch by a former employee of ARCP, accusing him of ordering subordinates to manipulate financial results at ARCP. The report stated, in part:

> In her suit, the accounting executive, Lisa P. McAlister, alleges Mr. Schorsch instructed her and former Chief Financial Officer Brian Block to shift numbers in the company's second-quarter results to cover up errors from the first quarter. Ms. McAlister repeatedly expressed concern about the directive to fellow executives and others, including in an email to Grant Thornton LLP, the real-estate-investment trust's audit firm, but her concerns were ignored, according to the complaint.

*     *     *

> "I was shocked that I was being blamed for an improper change in accounting that I had blown the whistle on, when Nick Schorsch and David Kay were really the ones to blame," Ms. McAlister said in an interview Wednesday.

In the report, Stephen Meister, Ms. McAlister's Lawyer representing her in the lawsuit, stated, in part:

> "Ms. McAlister blew the whistle on Schorsch's accounting manipulations; when it became apparent the stock would take a hit, Schorsch fired and publicly blamed her for what he had done, and she had tried but he refused to fix."

8

23.     Thus, Schorsch, who resigned from his executive positions at ARCP but still retained his executive positions at RCAP, was accused of directly engaging in and directing subordinates to engage in, fraud at ARCP and falsely blamed and then fired the very employee that tried to bring the shenanigans to light. The extent of the long term damage done to RCAP as a result of these allegations is as of yet undetermined, however, the immediate market reaction was swift and powerful.

24.     On the news of the lawsuit against Schorsch, shares of RCS Capital fell $1.81, or more than 15%, on heavy volume, to close at $9.95 on December 18, 2014.

25.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

28.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

29.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

30.     Plaintiff, as set forth in the accompanying Certification, acquired RCS Capital securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

31.     Defendant RCS Capital, through its subsidiaries, is engaged in the wholesale broker-dealer, and investment banking and capital markets business activities. The Company was formerly known as 405 Holding Corporation and changed its name to RCS Capital Corporation in February 2013. RCS Capital was incorporated in 2012 and is headquartered in New York, New York. RCS Capital trades on the NYSE ("NYSE") under the ticker symbol "RCAP."

32.     Defendant Nicholas S. Schorsch ("Schorsch") has served as the Executive Chairman of the board of directors of RCS Capital at all relevant times.

33.     Defendant Michael Weil ("Weil") has served as the Chief Executive Officer ("CEO") of RCS Capital at all relevant times beginning September 23, 2014.

34.     Defendant William M. Kahane ("Kahane") has served as the CEO of RCS Capital at all relevant times until his abrupt resignation on September 23, 2014.

35.     Defendant Brian D. Jones ("Jones") has served as the Chief Financial Officer of RCS Capital at all relevant times.

36.     The defendants referenced above in ¶¶ 32 – 35 are sometimes referred to herein as the "Individual Defendants."

37.     Defendant RCS Capital and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Period

38.     On February 12, 2014, the first day of the Class Period, the Company issued a press release, and filed a Form 8-K with the SEC, announcing Fourth Quarter and Full Year 2013 Operating Results. Income before taxes totaled $35.6 million, or $1.34 per adjusted share (inclusive of non-controlling interests), for the three months ended December 31, 2013, and $100.6 million, or $3.79 per adjusted share (inclusive of non-controlling interests), for the year. Revenue for the quarter increased $150.0 million, or 234%, to $214.1 million, as compared to $64.1 million for the three months ended December 31, 2012.

39.     On March 4, 2013, the Company filed a Form 10-K with the SEC which was signed by Defendants Kahane, Jones, and Schorsch, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Kahane and Jones, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     In the Form 10-K, the Company's statements make clear just how interconnected RCS Capital was with ARCP:

- Our "principals" refers to Nicholas S. Schorsch, the executive chairman of our board of directors, and William M. Kahane, our chief executive officer and a member of our board of directors, who directly or indirectly control RCAP Holdings, and "members of RCAP Holdings" refers to the members of RCAP Holdings, which include Messrs. Schorsch and Kahane as well as three other members of our board of directors, namely Edward M. Weil, Jr., Peter M. Budko and Brian S. Block, *all of whom are also members of AR Capital, LLC* and RCS Capital Management;

11

• "American Realty Capital" refers to AR Capital, LLC and, to the extent applicable, the American Realty Capital group of companies, which were founded in 2007 by Nicholas S. Schorsch, the executive chairman of our board of directors, and William M. Kahane, our chief executive officer and a member of our board of directors, to provide sponsors and advisors of direct investment programs with strategic and financial advice in connection with the formation, distribution, maintenance and liquidation phases of their offerings;

\*       \*       \*

American Realty Capital, which is controlled, directly or indirectly, by our principals who, directly or indirectly control RCAP Holdings, has accounted for 80% of our total revenues for the year ended December 31, 2013. For example, all of the $28.1 billion in value of mergers and acquisitions transactions, all of the $22.7 billion in purchase price of equity capital markets transactions and all of the $10.3 billion of debt capital markets transactions on which our investment banking and capital markets business advised in 2013 related to transactions involving direct investment programs or entities which had been sponsored or managed by American Realty Capital. Moreover, $713.5 million of our $886.5 million in revenues in 2013 resulted from sales of equity capital of direct investment programs or other entities sponsored or managed by American Realty Capital. Sales of equity capital from programs sponsored or managed by American Realty Capital excludes one investment program co-sponsored by American Realty Capital and in which an affiliate of American Realty Capital is an advisor, but in which none of the executive officers are affiliates of American Realty Capital and in which the sub-advisor, which is unaffiliated with American Realty Capital is responsible for selection of investments on behalf of the advisor.

41.    On May 1, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing First Quarter 2014 Operating Results. Adjusted net income was $20.4 Million or $0.77 per share on revenues of $187.2 million, compared to adjusted net income of $16.05 million or $0.61 per share on revenues of $218.6 million from the same quarter a year ago.

42.    On May 15, 2014, the Company filed a Form 10-Q with the SEC which was signed by Defendants Kahane and Jones, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Kahane and Jones, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43.     On June 10, 2014, the Company issued a press release and filed a Form 8-K

announcing the closing of a public offering. The press release stated in part:

> **New York, New York, June 10, 2014** – RCS Capital Corporation (NYSE: RCAP)
> ("RCAP") announced the closing of its previously announced public offering of
> 19,000,000 shares of RCAP Class A common stock by RCAP and 5,000,000 shares
> of RCAP Class A common stock by RCAP Holdings, LLC, the controlling
> stockholder of RCAP, at $20.25 per share.
>
> RCAP intends to use the net proceeds of approximately $357.7 million from the
> offering: (i) to fund cash consideration and other costs required to complete certain
> pending acquisitions; (ii) to meet certain repayment and funding obligations under
> RCAP's existing credit facilities not related to repayment of principal outstanding
> under such credit facilities; (iii) to pay fees payable in connection with certain
> private offerings; (iv) to pay outstanding indebtedness in connection with a pending
> acquisition; and (v) for general corporate purposes, including other acquisitions.

44.     On August 7, 2014, RCS Capital issued a press release and filed a Form 8-K with

the SEC announcing Second Quarter 2014 Operating Results. In the Press release, the Company

stated that revenues for the second quarter increased 22% from the first quarter to $825.7 million,

and adjusted net income increased 12% quarter-over-quarter to $42.6 million, or $0.49 per fully

diluted share.

45.     On August 14, 2014, the Company filed a Form 10-Q with the SEC which was

signed by Defendants Kahane and Jones, and reiterated the Company's previously announced

quarterly financial results and financial position. In addition, the 10-Q contained signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Kahane and

Jones, stating that the financial information contained in the Form 10-Q was accurate and disclosed

any material changes to the Company's internal control over financial reporting.

46.     On September 23, 2014, the Company issued a press release and filed a Form 8-K

with the SEC announcing the resignation of its CFO, Kahane. In the press release the Company

stated, in part:

New York, New York, September 23, 2014 – RCS Capital Corporation ("RCAP") (NYSE: RCAP) today announced the following executive changes and key leadership appointments:

Michael Weil, RCAP's President, has been appointed Chief Executive Officer of RCAP, effective immediately, succeeding William M. Kahane. Mr. Weil will be responsible for developing and implementing RCAP's strategic vision and overseeing the execution of RCAP's business plan. Mr. Kahane will remain a Director of RCAP.

47.    On October 1, 2014, RCS Capital issued a press release announcing the definitive

agreement to acquire Cole Capital. Specifically, the press release stated, in part:

**Transaction Summary**

RCAP will purchase Cole Capital for a base purchase price of $700 million consisting of $200 million of cash, $300 million of seller debt, and $200 million of RCAP Class A common stock. RCAP's common stock will be valued at a fixed price of $23.8156 per share, equivalent to the volume weighted average price of the common stock for the ten days ended September 29, 2014. Under the agreement with ARCP, RCAP may pay the common stock portion of the consideration in cash or stock. The seller financing consists of a seven-year, unsecured promissory note from RCAP to ARCP, with an initial interest rate per annum of 7.5%, pre-payable by RCAP after December 31, 2015, subject to certain limitations. In addition to the base purchase price, ARCP may earn up to an additional $130 million, payable in early 2016, based upon Cole Capital's actual 2015 EBITDA.

RCAP estimates that the transaction will contribute $0.51 per share to 2015 adjusted net income (excluding synergies), assuming the $200 million of stock compensation is paid in cash versus stock, depending on the amount of additional consideration paid in 2016.

The transaction will close in two steps, with certain advisory and other agreements being entered into promptly upon clearance of the federal anti-trust waiting period, and the second closing, upon which the stock and assets of Cole Capital will be acquired, upon clearance of FINRA's change of ownership waiting period. RCAP will pay a portion of the base purchase price at the second closing and the balance in April 2015.

**Transaction Highlights**

***Cole Capital Adds Seven Investment Programs to RCAP's Distribution Platform:*** The acquisition of Cole Capital will add seven investment programs to RCAP's suite of investment products, including Cole Corporate Income Trust (CCIT), Cole Credit Property Trust IV (CCPT IV), Cole Office & Industrial REIT (CCIT II), Cole Credit Property Trust V (CCPT V), Cole Real Estate Income

14

Strategy (Daily NAV) and two future programs, Cole Credit Property Trust VI (CCPT VI) and Cole Office & Industrial REIT (CCIT III). These programs represent nearly $19 billion in registered equity offerings and over $30 billion in estimated aggregate buying power.

***RCAP Adds Net Lease Real Estate Offerings:*** RCAP expects to benefit significantly from adding net lease real estate offerings to its wholesale distribution platform. Between 2008 and 2013, RCAP, through its wholly owned wholesale broker-dealer Realty Capital Securities, LLC ("RCS"), raised over $8.5 billion of equity capital for net lease real estate programs. RCAP believes that capitalizing on market awareness of the Cole Capital brand and adding net lease offerings will increase both the amount and velocity of capital raised on its platform.

***RCAP Engages ARCP as Exclusive Sub-Advisor:*** In connection with the sale, RCAP has engaged ARCP to act as sub-advisor to certain non-traded real estate investment trusts currently advised by Cole Capital. ARCP will be responsible for acquiring net lease real estate for Cole Capital's managed real estate investment trusts and overseeing property management activities. This sub-advisor arrangement brings together two of the most accomplished participants in the direct investment net lease real estate industry.

***Addition of Cole Capital Augments RCAP's Asset Management Business:*** The acquisition of Cole Capital increases RCAP's assets under management and the scale of its Investment Management business segment. Cole Capital estimates over $9.5 billion of managed assets by year-end 2014 in five non-traded REITs and other programs, including funds that closed in the second half of 2014 and that are under contract. RCAP also expects Cole Capital to add $73.7 million of recurring asset management EBITDA in 2015.

**Comments by Senior Management**

"The acquisition of Cole Capital is strategically and financially important to RCAP," said Michael Weil, RCAP's Chief Executive Officer. "We believe the combination of the two companies will achieve several significant strategic objectives in a single transaction, including growing our outstanding wholesale team's management and field ranks and materially expanding our investment management business segment by nearly 400%. Moreover, it diversifies RCAP's revenues substantially, increases our recurring revenue base, and adds a full complement of net lease real estate offerings to our product suite. In addition, it unites two of the most formidable companies in the net lease real estate industry. We expect Cole Capital to contribute recurring asset management EBITDA of more than $73 million in 2015, and we project the transaction will contribute $0.51 per share to adjusted net income (excluding synergies), depending on the amount of additional consideration paid in 2016."

David S. Kay, Chief Executive Officer of ARCP, noted, "This transaction significantly simplifies our business model, provides us a long-term economic stake in the growth and success of Cole Capital's investment programs and should enhance and accelerate the capitalization of these programs, thus improving the visibility of our fee stream while eliminating considerable overhead and volatility. As the leading wholesale distribution platform in the industry, RCAP is uniquely suited to increase the velocity and volume of Cole Capital's overall equity raising capabilities – with their expertise in the industry, we will be able to focus on acquiring and managing the real estate activities for the managed funds and our balance sheet."

"Adding Cole Capital to our wholesale platform offers many exciting benefits to RCS," said Bill Dwyer, Chief Executive Officer of RCS. "We are gaining an experienced team of professionals with complementary skills and relationships while adding seven additional investment solution offerings that represent significant equity capital raising potential, all the more so due to the sub-advisory arrangement with net lease leader, American Realty Capital Properties. Both RCS and Cole bring substantial history and expertise in net lease direct investments, so we believe the fit is ideal."

### Strategic Benefits of the Transaction for RCAP

*Positive Impact on Earnings and Capital Structure*: RCAP expects Cole Capital's managed REITs to generate a long-term durable stream of fee income from its asset management activities for RCAP. RCAP projects that the transaction will contribute $0.51 per share to 2015 adjusted net income (excluding synergies), depending on the amount of additional consideration paid in 2016.

*Strategic Partnership with ARCP*: ARCP is the uncontested leader in the net lease real estate investment trust industry. By entering into this strategic sub-advisory relationship with ARCP, RCAP expects Cole Capital's equity raise capabilities to accelerate and maintain a consistent growth trajectory, helping to support the acquisition efforts of Cole Capital's managed REITs and generating a steady stream of fee income for RCAP. As the sub-advisor, ARCP will be responsible for all of the property-level costs and personnel required to acquire and manage assets for Cole Capital's managed REITs.

*Competitive Advantages*: RCAP expects to create competitive advantage by joining with ARCP, a strong operating partner in both the traded and non-traded net lease real estate industry. RCAP anticipates it will raise and deploy billions of dollars of capital in this market segment as cap rates remain attractive, economic conditions remain stable, and supply-demand fundamentals are in line.

*Significant Opportunity to Grow the Cole Brand*: RCS has raised over $8.5 billion of equity capital in the net lease real estate sector. This expertise should enable RCAP to grow and accelerate capital raising for Cole Capital. Cole Capital's well-

respected wholesale team will benefit from a substantially broader client reach and deeper product base to service and provide value to its existing relationships and will become a valued part of RCAP's distribution business. RCAP expects the addition of Cole Capital's private capital management business will increase the total number of wholesalers to 244.

***Increased Recurring and Diversified Revenues and Earnings***: RCAP believes the acquisition of Cole Capital will help RCAP increase and diversify its recurring revenues and earnings. The acquisition of Cole Capital is anticipated to increase the EBITDA contribution for aggregate wholesale activities at RCAP for 2015 by an estimated $35.4 million, and asset management EBITDA by $73.7 million.

***Transaction Timing***: The transaction is expected to close in the fourth quarter of 2014, subject to certain regulatory filings and waiting periods and limited closing conditions. Subsequently, as soon as the FINRA change of control waiting period is satisfied, the Cole Capital wholesale and asset management business will transition to RCAP. Final payment for the second closing is scheduled in April, 2015.

48.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, including that: (1) ARCP's financial statements were materially false and misleading as a result of a massive accounting scandal perpetrated and concealed by senior management, including RCS Capital's Chairman, Defendant Schorsch; (2) RCS Capital's announced acquisition of Cole Capital from ARCP was at serious risk as a result of ARCP's accounting scandal; (3) RCS Capital's revenue stream from its relationship with ARCP was in jeopardy as a result of the fraud occurring at ARCP, directed in part by Defendant Schorsch; and as a result of the foregoing, (4) RCS Capital's public statements pertaining to its financial position as well as the Cole Capital acquisition were materially false and misleading at all relevant times.

## The Truth Emerges

49.     While RCS Capital was touting the benefits of the Cole Capital Acquisition, ARCP was in the midst of investigating and discovering a massive accounting scandal that several high-level executives had covered up for years. Specifically, On October 29, 2014, ARCP disclosed

17

that its Audit Committee had determined that an "error" in accounting for adjusted funds from operations ("AFFO") had previously been identified within the ARCP, but was intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the company's net loss for the three and six months ended June 30, 2014.   ARCP also announced that the previously issued financial statements and other financial information contained in ARCP's annual report for the year ended 2013, quarterly reports for the periods ended March 31, 2014 and June 30, 2014, and the company's earnings releases and other financial communications for these periods, should no longer be relied upon. Concurrently with this disclosure, ARCP announced the resignation of its Chief Financial Officer and Chief Accounting Officer, both of whom had key roles in preparing the allegedly fraudulent financial statements.

50.     Moreover, according to the *Wall Street Journal*, the Federal Bureau of Investigation has opened a criminal investigation into ARCP.  The SEC also plans to open an inquiry into the company, according to a person familiar with the situation.

51.     As a result of the accounting scandal revealed at ARCP, RCS Capital announced on November 3, 2014 that it has terminated the previously disclosed definitive agreement to acquire Cole Capital from ARCP.

52.     As a result of this news, shares of RCS Capital fell $2.72, or more than 16%, on extremely heavy volume, to close at $13.69 on November 1, 2014.

53.     On November 7, 2014, after the close of trading, it was reported on *Thinkadvisor.com* that Massachusetts regulator William Galvin had commenced an investigation of RCS Capital relating to the accounting errors were disclosed at ARCP.

18

54.    As a result of this news, shares of RCS Capital fell $0.65, or more than 5.7%, on heavy volume, to close at $10.67 on November 10, 2014.

55.    On November 14, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing Third Quarter 2014 Operating Results. Adjusted Net Income was $35.5 Million or $0.40 per diluted share, on revenue of $697.1 million, compared to Adjusted Net Income of $23.5 Million or $0.27 per diluted share, on revenue of $658.2 million.

56.    On November 14, 2014, the Company filed a Form 10-Q with the SEC which was signed by Defendants Weil and Jones, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Weil and Jones, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

57.    In the 10-Q, the Company confirmed the previously announced investigation by the Massachusetts Securities Division, stating in part:

> On November 7, 2014, Realty Capital Securities received a subpoena from the Massachusetts Secretary of the Commonwealth, Securities Division (the "Division"), requiring the production of certain documents and other materials, dated from January 1, 2014 to the present, relating to sales by Realty Capital Securities of certain non-traded REITs and similar products sponsored or co-sponsored by AR Capital, LLC. The Company is actively complying with the subpoena and cooperating with the Division.

> In addition, in the course of the Company's customary operations, its subsidiary broker-dealers, including but not limited to Realty Capital Securities, engage in ordinary course conversations with the SEC, FINRA and multiple state securities administrators and their regulatory agencies, including with respect to review of non-traded REIT and similar product offerings. Since ARCP's October 29, 2014 announcement regarding its historical financial statements and internal controls, the Company and its subsidiaries have continued to respond to on-going verbal inquiries, requests for correspondence, information and discussions with the SEC, FINRA and such state regulatory agencies, including with respect to the ARCP disclosure.

58.    On November 17, 2014, after the close of trading, it was reported on *Thinkadvisor.com*, that RCS Capital was contacted by the Financial Industry Regulatory Authority ("FINRA") and the SEC relating to the accounting errors disclosed by ARCP.

59.    On December 4, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that it had reached an agreement with ARCP to settle litigation relating to the Company's termination of the agreement to acquire Cole Capital Partners LLC from ARCP. In the press release, the Company stated in part:

> Pursuant to the terms of the settlement, RCS Capital has agreed to pay ARCP a negotiated break-up fee consisting of a cash payment of $32.7 million and a $15.3 million, two-year promissory note . . . RCS Capital and ARCP have also agreed, among other things, that ARCP will keep the $10 million payment delivered by RCS Capital in connection with the first closing and RCS Capital will release ARCP from its obligation to pay $2 million to RCS Capital in respect of structuring services provided by Realty Capital Securities, LLC, a subsidiary of RCS Capital, in connection with ARCP's May 2014 equity offering.

60.    On December 15, 2014, ARCP issued a press release announcing the resignation of Schorsch as its executive chairman and director. In the press release, ARCP also announced stated, in part:

> In connection with Mr. Schorsch's departure as Executive Chairman, ARCP will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder. These steps will not only enhance the Company's corporate governance structure but will also lead to further simplification of its business relationships.

61.    While not specifically mentioning RCS Capital, it was clear that that ARCP's "unwinding" of its relationships with "entities in which Mr. Schorsch maintains an executive or director-level role" include its relationship with RCS capital. This would eliminate a significant source of the Company's revenue, as 80% of RCS's revenue for 2013 came from ARCP.

62.    As a result of this news, shares of RCS Capital fell $1.35, or more than 11%, on heavy volume, to close at $10.46 on December 15, 2014.

63.     On December 18, 2014, the *Wall Street Journal* reported that a lawsuit was filed

against Schorsch by a former employee of ARCP, accusing him of ordering subordinates to

manipulate financial results at ARCP. The report stated, in part:

> In her suit, the accounting executive, Lisa P. McAlister, alleges Mr. Schorsch
> instructed her and former Chief Financial Officer Brian Block to shift numbers in
> the company's second-quarter results to cover up errors from the first quarter. Ms.
> McAlister repeatedly expressed concern about the directive to fellow executives
> and others, including in an email to Grant Thornton LLP, the real-estate-investment
> trust's audit firm, but her concerns were ignored, according to the complaint.

*     *     *

> "I was shocked that I was being blamed for an improper change in accounting that
> I had blown the whistle on, when Nick Schorsch and David Kay were really the
> ones to blame," Ms. McAlister said in an interview Wednesday.

In the report, Stephen Meister, Ms. McAlister's Lawyer representing her in the lawsuit, stated, in

part:

> "Ms. McAlister blew the whistle on Schorsch's accounting manipulations; when it
> became apparent the stock would take a hit, Schorsch fired and publicly blamed her
> for what he had done, and she had tried but he refused to fix."

64.     Thus, Schorsch, who resigned from his executive positions at ARCP but still

retained his executive positions at RCAP, was accused of directly engaging in and directing

subordinates to engage in fraud at ARCP and falsely blamed and then fired the very employee that

tried to bring the shenanigans to light.

65.     On the news of the lawsuit, shares of RCS Capital fell $1.81, or more than 15%, on

heavy volume, to close at $9.95 on December 18, 2014.

66.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

21

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired RCS Capital securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RCS Capital securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by RCS Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of RCS Capital;

- whether the Individual Defendants caused RCS Capital to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of RCS Capital securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- RCS Capital securities are traded in efficient markets;

23

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold RCS Capital securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of RCS Capital securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire RCS Capital securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for RCS Capital securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about RCS Capital's finances and business prospects.

80.     By virtue of their positions at RCS Capital, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

25

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

81.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of RCS Capital securities from their personal portfolios.

82.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of RCS Capital, the Individual Defendants had knowledge of the details of RCS Capital's internal affairs.

83.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of RCS Capital. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to RCS Capital's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for RCS Capital's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning RCS Capital's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired RCS Capital securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

84.     During the Class Period, RCS Capital's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of RCS Capital securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of RCS Capital securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of RCS Capital's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false statements to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     During the Class Period, the Individual Defendants participated in the operation and management of RCS Capital, and conducted and participated, directly and indirectly, in the conduct of RCS Capital's business affairs. Because of their senior positions, they knew the adverse non-public information regarding RCS Capital's business practices and future prospects.

89.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to RCS Capital's acquisition of Cole Capital as well as future relationship with ARCP, and to correct promptly any public statements issued by RCS Capital which had become materially false or misleading.

90.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which RCS Capital disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause RCS Capital to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of RCS Capital within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of RCS Capital securities.

91.     Each of the Individual Defendants, therefore, acted as a controlling person of RCS Capital. By reason of their senior management positions and/or being directors of RCS Capital,

each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, RCS Capital to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of RCS Capital and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by RCS Capital.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained  as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   December 28,  2014

Respectfully submitted,

**POMERANTZ LLP**

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          fmcconville@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I,   GRADY SCOTT WESTON   , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against RCS Capital Corporation ("RCS Capital" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire RCS Capital securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired RCS Capital securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in RCS Capital securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed  12/16/14
_____
(Date)

_____
(Signature)

GRADY SCOTT WESTON
_____
(Type or Print Name)

**RCS CAPITAL (RCAP)**                              **Weston, Grady Scott**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 9/9/2014 | PUR | 100 | $22.5200 |